# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHENR DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ERIC JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number: |
| v. | ) | |
| | ) | 2:16-cv-01349-MHH |
| THE CITY OF BIRMINGHAM, | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

COUNSEL FOR PLAINTIFF:

Heather Newsom Leonard
HEATHER LEONARD, PC
2105 Devereux Circle, Suite 111
Birmingham, AL 35243
(205) 977-5421 – voice
(205) 278-1400 – facsimile
Heather@HeatherLeonardPC.com

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.     MR. JACKSON IS A QUALIFIED INDIVIDUAL WITH A
         DISABILITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

         A.    Mr. Jackson could perform the essential functions of his job. 12

         B.    Seeking SSDI benefits is not fatal to an ADA claim . . . . . . 14

         C.    Mr. Jackson identified a reasonable accommodation. . . . . . .16

    II.    THE DEFENDANT VIOLATED USERRA. . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

# INTRODUCTION

Eric Jackson served his country honorably in Afghanistan. He suffers from Post-Traumatic Stress Disorder ("PTSD") due to the trauma he experienced during his service. When he spent time in the Wounded Warrior program at Ft. Gordon Georgia and took the time permitted by the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), the City of Birmingham was frustrated by his absence, viewed that time as "a serious abuse of taxpayer dollars," thought he was "milking it" and was "not cool" with him having the time away from work required by the law. Shortly after Mr. Jackson returned to work, he began requesting the accommodation of a modified schedule/start time while his doctors were adjusting his medications and treatment for his PTSD. This request was not considered or discussed by the Defendant. After being advised by Human Resources that due to the reemployment protections under USERRA, Mr. Jackson could only be terminated for cause, Chief of Traffic Operations Will Goodman directed Mr. Jackson's immediate supervisor Jose Martinez to "go ahead and get our documentation prepared so that we can turn it over to Mr. Dawkins for dismissal." Over the course of the next few weeks, Mr. Goodman and Mr. Martinez gave Mr. Jackson multiple written disciplinary warnings for absences and tardies related to his PTSD which culminated in Mr. Jackson's termination.

Defendant's motion for partial summary judgment should be denied because the escalator principle applied to Mr. Jackson's service resulting in him having satisfied the "probationary" period required of all classified employees working for the City of Birmingham. As a result, he was entitled to the use of his accrued leave for absences related to his Post Traumatic Syndrome Disorder. Further, he was able to perform the functions of his job with reasonable accommodation, so he was a qualified individual with a disability for purposes of the Americans with Disabilities Act ("ADA").

## STATEMENT OF THE CASE

Eric Jackson began working for the Defendant, the City of Birmingham, on January 17, 2012 as a Parking Enforcement Officer. (Doc. 20-1, p. 69:8-1). The position's job description identifies the essential functions as: patrols assigned area either by foot or vehicle; issues parking citations; informs violators of relevant parking laws and regulations; assists the public by giving directions and informing them of available parking facilities; may assist the public in locating vehicles; [operates and programs hand held computer units and printers used to issue citations; performs routine preventative maintenance on three-wheel vehicles; assists the flow of traffic by asking drivers who are double parked, parked in loading zones, handicapped spaces or no parking zones to move to designated areas; reports all damaged parking meters, street markers and signs. (Doc. 23-3).

Per § 2.13 of the Supplemental Personnel Policies and Procedures for the City of Birmingham, "[c]lassified employees shall serve a probationary period of twelve months." (Doc. 20-9, p. 6 of 14).[1]

During his first week of employment, Senior Parking Enforcement Officer Tiwana Bailey provided him with training on use of the hand-held set and the vehicle/buggy used by Parking Enforcement Officers, how to write tickets, and on learning his patrol route. (Doc. 20-1, p. 77:11-23; Doc. 23-24, pp. 16:21 – 18:01; Doc. 31-1, ¶ 2). He was not provided with direct training on parking ordinances; he was given the book containing the ordinances and told to read it. (Doc. 20-1, pp. 79:21-80:6). During Mr. Jackson's first week of employment, Ms. Bailey accompanied Mr. Jackson on his route, explaining to him what the job consisted of and working the area. (Doc. 20-1, 88:8-19:13; Doc. 31-1, ¶2; Doc. 23-24, pp. 16:21-18:01). For the next two weeks of his employment, Mr. Jackson worked by himself in the field without supervision. (Doc. 31-1, ¶ 2; Doc. 20-1, pp. 88:8-19:13). On February 6, 2012, Mr. Jackson attended an orientation class on City policies. (Doc. 20-1, p. 73:1-20).

---

[1]     The Parking Enforcement Officer position is a classified position. (Doc. 22-1, p. 61:6-8). Per the City's policy, a probationary employee may earn sick and vacation leave time, but is not permitted to use it during the probationary period. (Doc. 20-9, p. 6 of 14). The City's attendance policies relating to discipline for absences are applied to same to all employees, regardless of probationary status. (Doc. 23-1, pp. 48:5–13; Doc. 22-1, pp. 55:22-56:10, 62:19-62:22).

On February 7, 2012, Mr. Jackson received a letter to provide to the City from the Alabama Army National Guard stating that Mr. Jackson would be deploying to Afghanistan later that month for one year. (Doc. 20-14). Mr. Jackson worked through February 9, 2012 before reporting for active duty military service. (Doc. 20-12; Doc. 20-13). While he was on military leave, the City was supposed to treat his employment as if he were still at work. (Doc. 21-1: pp. 76:22-78:15). While Mr. Jackson was on military leave, the City's Office of Personnel sent him a letter stating that pursuant to Military Leave Resolution 392-08,[2] he would receive benefits and pay while deployed in a war zone or area of hostile fire or imminent danger. (Doc. 20-19). Even though Mr. Jackson was on military leave, the City performed three-month and nine-month performance appraisals on him in 2012. (Doc. 21-4).[3] The City also awarded him a merit pay increase in 2014 based on his time employed with the City. (Doc. 23-1, pp. 78:16-79:12, 80:09-13; Doc. 23-4).

In 2013, Mr. Jackson's military service was extended for another year to go through 2014, and he was assigned to the Warrior Transition Battalion (WTB), commonly known as the Wounded Warrior Program, in Ft. Gordon, Georgia,

---

[2] Military Leave Resolution 392-08 provides that any permanent employee (defined as an employee who has completed the mandatory probationary period) will receive pay and benefits during their deployment. (Doc. 21-3). This benefit is only provided to non-probationary employees. (Doc. 21-1, pp. 61:07-62:06

[3] The appraisals listed his anniversary date as 1/16/2013 and hire date as 1/17/2012. (Doc. 21-4).

where he received treatment for PTSD.  (Doc. 31-1, ¶3; Doc. 20-15, Doc. 20-16; Doc. 20-17; Doc. 20-18; Doc. 20-1, pp. 96:7-98:15).  Mr. Jackson received an honorable discharge for medical reasons on February 24, 2014.  (Doc. 20-1, p. 100:4-22; Doc. 20-20).

Shortly before Mr. Jackson's military leave ended and the 90-day return period required by USERRA began, Chief of Traffic Operations Will Goodman began feeling frustrated that Mr. Jackson had not returned to work.  (Doc. 23-1, pp. 95:23-96:01, 104:15-21; Doc. 22-1, pp. 114:18-117:15, 118:02-09).[4]  In February 2014, Mr. Goodman emailed Traffic Engineer/department head Greg Dawkins, Assistant Traffic Engineer Sedrick Rutledge, and Mr. Jackson's supervisor, Jose Martinez, that he viewed Mr. Jackson's situation as a "[s]erious abuse of taxpayers dollars."  (Doc. 23-5).  When the payroll coordinator emailed Mr. Goodman on March 10, 2014, that Mr. Jackson had up to 90 days to report to work (i.e. could report to work in May), Mr. Goodman responded, "[n]ot cool with me at all . . . He's milking it! If he can handle all of his other affairs he should be able to come to work."  (Doc. 23-11).

The next day, Mach 11, 2014, Mr. Goodman communicated to Mr. Dawkins and Mr. Rutledge:

---

[4]      Mr. Goodman testified he was frustrated that Mr. Jackson had not returned and "with the situation of us having to continue to do the same volume of work with an employee missing." (Doc. 22-1, p. 117:9-15).

I know the policy allows Mr. Jackson to report 90 days after the end of military duty. I just have a problem with this whole flagrant abuse of the system. Any one who can conduct a business, record rap videos and handle all of the other situations that he is managing has to be somewhat sound. I wish Mrs. Polk would look into this whole policy of paying personnel a full salary while they're in a military status. I think we're creating a loop hole for abusers.

(Doc. 23-7).

Mr. Goodman continued to exchange emails with Mr. Dawkins on that date about the rules and policies governing Mr. Jackson's return to work, and Mr. Goodman wrote with respect to Mr. Jackson, "I would like to deny him vacation because we need him back asap." (Doc. 23-12).

Mr. Jackson returned to work for the City on May 27, 2014. (Doc. 20-1, p. 106:8-14; Doc. 31-1, ¶ 4). On June 2, 2014, he attended the City's orientation class on City policies. (Doc. 20-1, p. 108:11-22; Doc. 31-1, ¶ 4). For the first week following his return, Mr. Jackson received direction on how to write tickets, traffic ordinances and patrol routes, but following that week he worked in the field without observation or supervision by anyone. (Doc. 31-1, ¶ 4).

After Mr. Jackson returned to work, he initiated several conversations and discussions with Mr. Martinez about his PTSD and that he was having issues sleeping and arriving to work due to his medication, having issues of stress dealing with horns blowing, people yelling and lights flashing. (Doc.

20-58, Doc. 20-1, pp. 112:17-114:12, 157:18-161:23, 162:18-163:1, 166:11-167:4; Doc. 31-1, ¶¶ 5 -7).   Due to an inability to sleep because of his PTSD, Mr. Jackson was taking medication which often caused him to sleep through alarms.  (Id.).  The lack of sleep made him more easily triggered by noises and confrontation.  (Id.).  For this reason, Mr. Jackson requested the accommodation of a modified or flexible start time and for time off for medical appointments so that he could work with his doctor to adjust his treatment regime.  (Id.)  Mr. Martinez indicated he would speak to Mr. Goodman about the requests for accommodation, but Mr. Jackson never received a response.  (Doc. 20-1, pp. 163:17-164:13).  Even though modifications of schedules and job duties can be reasonable accommodations (Doc. 23-1, p. 74:13-23) the City did not evaluate whether Mr. Jackson's requests for accommodation were reasonable. (Id., pp. 75:01-21, 127:14-23, 131:22-133:15; Doc. 21-1, pp. 38:02-06).

After Mr. Jackson called in sick on July 3, 2014, Mr. Goodman wrote Jose Martinez he saw the absence as Mr. Jackson's "way of cordially saying he does not want the job.  Let go ahead and get our documentation prepared so that we can turn it over to Mr. Dawkins for dismissal."  (Doc. 21-10). Mr. Martinez emailed some notes on Mr. Jackson to Mr. Goodman and noted his "concern [that Mr. Jackson] may have personnel issues outside of

work that he may have to resolve to be able to perform the job safely." (Id.).

A few days later, on July 10, human resources emailed Mr. Dawkins about a meeting it had with Mr. Martinez concerning Mr. Jackson. (Doc. 23-9). Human resources cautioned that under § 4316 of USERRA, Mr. Jackson was protected from discharge "only in the exception it is for 'CAUSE.'" A few hours later, Mt. Goodman presented Mr. Jackson with two written reprimands for absences associated with the effects of Mr. Jackson's PTSD. (Doc. 20-32). Mr. Jackson renewed his request for accommodation, telling Mr. Goodman he needed flexibility with his schedule. (Doc. 20-1, 164:20-165:6). Mr. Goodman responded by saying he could "tell when it's real" in reference to Mr. Jackson's statements about his PTSD and medication causing him to be late. (Doc. 20-1, pp. 216:5-217:7)

In response, on or around July 15, 2017, Mr. Jackson presented the City with a letter from his doctor at the Veteran's Administration confirming his diagnosis of PTSD, the doctor's recommendation Mr. Jackson take FMLA, and that the medication component of Mr. Jackson's treatment was being modified. (Doc. 20:39, Doc. 23-11). The letter shared that Mr. Jackson feared retaliation and an effort to "get rid of him" for revealing his condition. (Id.). In response to the letter, Mr. Dawkins removed Mr. Jackson from the street, assigned him to a desk, and required him to undergo

a psychological examination at the University of Alabama at Birmingham. (Doc. 31-1, ¶ 8). Prior to this point, Mr. Jackson was "doing pretty good" in his job. (Doc. 23-24, p. 30:18-22). While he had made some mistakes in writing tickets when he started, he had improved and reduced the mistakes. (Id., pp. 30:23-31:12). Jose Martinez felt Mr. Jackson was physically and mentally able to work. (Doc. 21-1, p103:11-13). Mr. Jackson became one of the top performers. (20-1, pp. 217:12-218:22). His immediate supervisor, Tiwana Bailey, did not observe Mr. Jackson having any problems performing the Parking Enforcement Officer job. (Doc. 23-24, p. 32:3-6).

The neuropsychological exam performed at UAB on July 22, 2014 confirmed the diagnosis of PTSD and recommended intense consistent management of the PTSD , a review of his current medications since his current regime was not effective, and that he be allowed to take breaks every 90 minutes to reduce stress. (Doc. 23-13). Around this time, Mr. Jackson again tried to follow up with Mr. Martinez about whether Mr. Goodman had responded to his requests for accommodation, but did not receive a response. (Doc. 20-1, p. 168:17-21).

On July 29, 2014, Mr. Dawkins sent out a Notice of Determination Hearing to Mr. Jackson. (Doc. 23-19)[5] A day or two before the notice was sent out, Mr. Goodman recommended Mr. Jackson's termination to Mr. Dawkins. (Doc. 22-1, p. 60:1-6). On July 30, 2014, the City issued three additional written reprimands to Mr. Jackson. (Doc. 20-33). Around this time, Mr. Goodman said to Mr. Jackson either "I don't want to deal with him" or "I don't want to deal with that" about Mr. Jackson's PTSD and Mr. Jackson's employment. (Doc. 20-1, p. 219:1-14).

During the August 8 Determination Hearing, Mr. Jackson objected to the accuracy of the allegations in the Determination Notice, presented documentation on his PTSD, phone records showing when he had called in for permission to be late, absent, or leave early, and printouts on the ADA. (Doc. 20-1, pp. 148:9-149:15). The Decision Upon Determination Hearing dated August 9, 2014 signed by Mr. Dawkins stated that the result of the Determination Hearing was to sustain the charges and terminate Mr. Jackson's employment effective August 11, 2014. (Doc. 20-37). In making the decision to terminate, Mr. Dawkins relied on documentation provided to

---

[5]     A Determination Hearing is not a true hearing. Witnesses are not called or examined. (Doc. 23-1, p. 61:13-65:6). An employee may make or present a statement in her defense. (Id.).

him by Mr. Goodman. (Doc. 23-1, pp. 66:21-67:04; Doc. 22-1, pp. 95:01-96:05).[6]

Mr. Jackson observed that his female coworkers were frequently late, absent and/or left early without consequence. (Doc. 20-1, pp. 221:23-226:12). Because the City considered Mr. Jackson probationary, he was not allowed to use any accrued or sick leave time for any of his attendance.

The City's attendance records reveal Brenda Mitchell had 25 absences, lates, or leave earlies in 2015 and 14 absences, lates, or leave earlies in 2016. (Doc. 31-2). Andrea Kennedy had seventeen absences, lates, or leave earlies between January and July of 2014. (Doc. Id).[7] Catherine Owens had thirteen absences, lates, or leave earlies from June 12, 2014 through December 16, 2014. (Id.). In 2015, she had 32 absences, lates, or leave earlies. (Id.). Delores Murrell had 27 absences, lates, or leave earlies in 2015. (Id.)[8] Mary Holmes had 29 absences, lates, or leave earlies in 2015. (Id.)

---

[6]    It is unlikely Mr. Dawkins reviewed the evidence submitted by Mr. Jackson because Mr. Dawkins testified Mr. Jackson did not present anything in the Determination Hearing. (Doc. 23-1, pp. 154:13-155:01).

[7]    The City modified Ms. Kennedy's work schedule so that she could leave work early to attend school. (Doc. 22-1, pp. 34:23-36:04).

[8]    Will Goodman testified he felt that was an acceptable number of absences, lates, or leaving earlies. (Doc. 22-1, 39:22-40:20).

ARGUMENT

## I.  MR. JACKSON IS A QUALIFIED INDIVIDUAL WITH A DISABILITY.

### A.  Mr. Jackson could perform the essential functions of his job.

Under the ADA, an employer may not discriminate against a "qualified
individual on the basis of disability." 42 U.S.C. § 12112(a).  In order to be a
"qualified individual," the plaintiff must be able to perform the essential functions
of his or her employment position with or without reasonable accommodation. 42
U.S.C. § 12111(8); *see also Reed v. Heil*, 206 F.3d 1055, 1062 (11th Cir. 2000).
Accordingly, "[b]ecause the ADA reserves its protections for individuals still able
to perform the essential functions of a job, albeit with reasonable accommodation,
a plaintiff who is totally disabled and unable to work at all is precluded from suing
for discrimination thereunder." *Kurzweg v. SCP Distribs., LLC*, 424 Fed. Appx.
840, 843 (11th Cir. 2011) (*quoting Slomcenski v. Citibank, N.A.*, 432 F.3d 1271,
1280 (11th Cir. 2005)).

Mr. Jackson could perform the essential functions of his position as set forth
in his job description.  (Doc. 31-1, ¶ 6).  His supervisors, Tiwana Bailey and Jose
Martinez, noted he was "doing pretty good," was not struggling with any parts of
his job, was not having problems doing the job, met the physical demands of the
job, possessed the knowledge and skills to perform the job, had the ability to
communicate, and was physically and mentally able to work.  (Doc. 23-24, pp.

30:5-22, 32:03-06; Doc. 21-1, pp. 34:08-36:03, 103:11-13). However, he required the reasonable accommodation of a modified start time during the period when his doctors were adjusting his treatment and medication for his PTSD. (Doc. 31-1, ¶¶ 5-7).[9] The July 22 psychological exam required by the City did not note Mr. Jackson was unable to work; rather it recommended changing his medication regime and allowing him more frequent breaks to reduce the stress caused by his triggers. (Doc. 23-13).

Defendant emphasizes that Mr. Jackson could not meet the attendance required for the Parking Enforcement Officer position. This was where Mr. Jackson's request for an accommodation came into play. However, the attendance of his coworkers shows that (a) it was possible to receive a modified schedule, as the City permitted Andrea Kennedy to attend school, and (b) that significant absences, lates and early departures were common among all Parking Enforcement

---

[9]     Defendant attempts to rewrite the ADA by arguing that under *Davis v. Fla Power & Light Co.*, 205 F.3d 1301, 1305, (11th Cir. 2000) holds that if an employee can only perform the function of a job with a reasonable accommodation, he is not protected or covered by the ADA. (Doc. 26, p. 10). Defendant's argument directly contradicts the plain language of the ADA which defines a "qualified individual with a disability" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires . . ." 42 USCS § 12111. Defendant's argument would essential doom any "failure to accommodate" claim under the ADA because no employee requiring an accommodation would qualify for protection under the statute. That is clearly not what the Eleventh Circuit intended, as is underscored by the elements to prove a failure to accommodate claim: (1) the employee has a disability within the meaning of the statute; (2) defendant had notice of her disability; (3) with a reasonable accommodation she could perform the essential functions of her position; and (4) the defendant refused to make such accommodations. *Davis v. Wal-Mart Stores East, LP*, 2017 U.S. Dist. LEXIS 150206, *3-4 (S.D. Ga. Sept 15, 2017).

Officers.  Yet, the City did not use the absences of Mr. Jackson's coworkers to terminate their employment.

        B.     <u>Seeking SSDI benefits is not fatal to an ADA claim.</u>

Defendant argues that because Mr. Jackson applied for and received Social Security Disability Benefits, he estopped from arguing he is a qualified individual with a disability.  However, the United States Supreme Court rejected the Defendant's argument and explicitly held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 797, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999). In *Cleveland*, the Supreme Court set forth three scenarios under which an ADA plaintiff may be able to perform the essential functions of her employment and still be deemed disabled by the SSA.  An applicant might be able to perform the work with a reasonable accommodation, but the SSA does not take possible reasonable accommodations into account in determining whether an SSDI applicant is disabled.  *Cleveland*, 526 U.S. at 803-05.  Second, an SSDI applicant who can actually perform the work may qualify as disabled under the impairment listings in the SSA's regulations. *Id.*  Finally, an SSDI applicant may fall within the agency's nine-month trial-work period used to facilitate reentry into the workforce.  *Id.*

In *Cleveland*, the Supreme Court held that the proper standard is *not* to require an ADA plaintiff to *rebut* a presumption of estoppel. *Cleveland,* 526 U.S. at 806; *see also Hollingsworth v. O'Reilly Auto. Stores, Inc.,* 4:13-CV-01623-KOB (N.D. Ala. Jan. 30, 2015). Instead, a plaintiff need only "proffer a sufficient explanation" of the contradiction between an earlier total disability assertion and a claim that he is a qualified individual. *Id.* The Supreme Court found that Cleveland provided a "sufficient explanation" where, like Mr. Jackson, her disability statements "were made in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work." *Id.*

Mr. Jackson has provided a sufficient explanation as to why he is a qualified individual despite having sought disability benefits. The City, in removing him from the field and forcing him to sit at a desk reading regulations he already knew led him to feel he was useless due to his PTSD. (Doc. 31-1, ¶ 8). The termination of his employment hurt his self-respect; he felt he was being told he was not capable of being able to work due to his disability. (Id., ¶ 10). This led him to apply for disability benefits. He did not recall being asked during the process if he could work with an accommodation. (Id.). He knew that he could work, despite his disability, if provided a reasonable accommodation. (Id.).

Like the present case, the plaintiff in *Cleveland* alleged that the lack of accommodation led to her need for disability benefits. The Court found this, along

with the forum in which the benefit statements were made, provided a "sufficient explanation" of the inconsistencies to survive summary judgment.  Mr. Jackson's disability statements were made in the same forum as Cleveland's—one where neither Mr. Jackson nor the physician did would know all of the reasonable accommodations the City could have offered since the City refused to engage in any dialogue with Mr. Jackson about his need for accommodation. As the Supreme Court noted, "There are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 802-03.  This is one of those cases. The reasoning advanced by the City would cause preclusion of numerous viable disability claims, where the employer's own failure to accommodate necessitated the employee's need to secure disability benefits.

C.    Mr. Jackson identified a reasonable accommodation.

Next the City argues that modifying Mr. Jackson's schedule to permit him flexibility in attendance related to treatment and symptoms of his PTSD.  An employer discriminates against an otherwise qualified employee by "not making reasonable accommodations to the known physical or mental limitations of [the] employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship" on the employer's business operations. 42 U.S.C. § 12112(b)(5)(A). Compared to other forms of discrimination under the ADA, the analysis for failure-to-accommodate claims is streamlined. There is no burden on

the employer to articulate legitimate, non-discriminatory reasons for its actions or on the plaintiff to establish pretext. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007); *see also Abram v. Fulton Cty. Gov't*, 598 Fed. Appx. 672, 676 (11th Cir. 2015). If an employer fails to reasonably accommodate an otherwise qualified disabled employee, and the employer cannot show that accommodating the employee would have imposed an undue hardship, then the employer has violated the ADA. *See Holly,* 492 F.3d at 1262.

The City cannot show Mr. Jackson's request for accommodation would have imposed an undue hardship; it never made that analysis. It ignored Mr. Jackson's request to modify his schedule or provide flexibility with his schedule while his treatment regime and medications were being adjusted. The City did not engage in any dialogue with him about the request.[10] The City did not analyze or consider whether the request was reasonable, feasible or burdensome. The City did nothing to consider accommodating Mr. Jackson or whether his request was reasonable.

---

[10]     "The interactive process begins when an employee requests an accommodation. " *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005). An employer who is aware of its responsibility to provide a reasonable accommodation "must make a reasonable effort to determine the appropriate accommodation." *Id.* Both the employer and the employee have a duty to act in good faith during the interactive process. *Id.* (citing *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 333 (3d Cir. 2003)). "The absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation." *Id.* (citing *Picinich v. United Parcel Serv.*, 321 F.Supp.2d 485, 514 (N.D.N.Y. 2004)). Ultimately, "[i]f a jury could conclude that [an employer] failed to engage in good faith in the interactive process, and that failure led to defendant not according reasonable accommodations to [the employee] in a timely manner, summary judgment cannot be granted." *Id.*

To survive summary judgment, Ms. Jackson "need only show that [his proposed] 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). If he does that, then the City "must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Barnett*, 535 U.S. at 402. If Mr. Jackson cannot show that his proposed accommodation is reasonable in the run of cases, then he still may defeat summary judgment by showing that "special circumstances warrant a finding that . . . the requested 'accommodation' is reasonable on [his] particular facts." *Id.* at 405; *see also Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) ("Whether an accommodation is reasonable depends on [the] specific circumstances [of each case].").

Under the ADA, reasonable accommodations may include: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). Mr. Jackson presented evidence the City had allowed a modified schedule to another coworker so she could leave work early to attend school.  The City absorbed and tolerated frequent

late arrivals and early departures among his coworkers.  Inherent in Mr. Jackson's request for flexibility with his schedule was a request to use the sick and vacation leave he had accrued.  Had the City not deemed Mr. Jackson "probationary," he would have been able to use his earned sick and vacation leave time for the time away from work that was used to terminate him.  (Doc. 23-1, p. 110:16-20) ("But then on probationary status, he can't take – he can't take vacation and things like that for the time that he misses. It is written down as late or AWOLS.")  These facts all show that the City was able to modify Mr. Jackson's schedule and/or to allow him to use earned leave[11] to apply to (and protect) his attendance while Mr. Jackson's treatment regimen was being adjusted.

Because the facts of this case show Mr. Jackson could perform the functions of his job.  He required the accommodation of being allowed the time for his medical treatment to be adjusted so that the effects of his PTSD and its treatment would not cause him to oversleep and/or experience heightened stress making him more susceptible to triggers at work.  The City's ability to allow him to use his accrued leave, tolerate the attendance issues (as it did with other employees), or

---

[11]     The VA, in its July letter to the City, suggested FMLA leave as an accommodation for Mr. Jackson.  There is no indication the City evaluated that request for an accommodation. USERRA requires that in determining whether a reemployed employee has met the FMLA's months-employed and hours-of-service requirements, the entire period of the employee's absence from employment due to or necessitated by military service counts as time at work.  20 C.F.R. § 1002.210.  *See* 29 C.F.R. §§ 825.102, 825.110(b)(2)(i) and (c)(2), 825.702(g).  There is no evidence from the City that allowing Mr. Jackson intermittent FMLA applicable to his absences related to PTSD and its treatment would have imposed an undue hardship.

modify his schedule (as it did for another employee) all show that the City would not have experienced any undue burden had it honored his request. Summary judgment is due to be denied.

II.     THE DEFENDANT VIOLATED USERRA.

Section 4316(c) of USERRA protects from discharge without just cause employees who are reemployed after returning from a period of military service lasting more than 30 days. 38 U.S.C.A. § 4316(c). Section 4313(a) requires an employer to reemploy returning employees. 38 U.S.C.A. §4313(a). Reemployment under USERRA involves more than simply a return to the same job the employee held prior to leaving for active service. The regulations promulgated under USERRA have recognized an "escalator" principle inherent in § 4313(a)(2)(A). "A key provision of USERRA's reemployment protections is the 'escalator principle,' which 'requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of [military] service.'" *Fannin v. United Space Alliance, L.L.C.*, 2009 U.S. Dist. LEXIS 6468, 2009 WL 139878, at *6 (M.D. Fla. Jan. 20, 2009), aff'd in part *sub nom. Fannin v.*

*United Space All., LLC*, 392 F. App'x 788 (11th Cir. 2010) (quoting 20 C.F.R. § 1002.191).[12]

The key issue with respect to the application of the escalator principle is whether a probationary period is necessary for a bona fide training period and/or period of observation or whether it is satisfied simply by attaining a certain amount of time in a position. Kathryn Pistcitelli and Edwards Still, *The USERRA Manual*, §5.5 (2017). When the probationary period is required for actual training or observation, rather than merely being time served in the position, an employer may require the employee to complete the probationary period upon the employee's return. *Id.*[13]

The evidence in this case shows that the probationary period set forth in the City's policies is not a period of bona fide training or observation, but rather satisfied through time served in the position. The language of the probationary provision, which applies to all classified employees, does not reference training or observation. It simply references time in the position. This is reiterated by the

---

[12]     This concept dates back to the Supreme Court's post-World War II decision in *Fishgold v Sullivan Drydock & Repair Corp.*, 328 U.S. 275 (1946), where the Supreme Court said that a reemployed veteran "does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war." 328 U.S. at 284-85.

[13]     With regard to apprenticeships and the escalator position, the Department has long held that if the apprentice position is bona fide and not merely a time-in-grade requirement, the returning service member should be restored as an apprentice at a level that reflects both the experience and training he or she received pre-service. 70 FR 75246, 75272.

facts that the City performed evaluations of Mr. Jackson while he was on leave and awarded a merit pay increase. By doing so, the City's actions acknowledge that the probationary period was simply satisfied by time in service.

Mr. Jackson's "training" by the City consisted of a one-day class on policies (which he attended twice), and approximately a week of direct supervision (which he completed twice). After that, he worked without supervision and was given the same oversight and observation as non-probationary employees. (Doc. 31-1, ¶ 4; Doc. 21-1, pp. 52:13-53:01). The probationary period required by the City is subject to the escalator principle because it is simply a "time served in the position" period. Further, the City's decision to treat Mr. Jackson as being covered under its Military Leave Resolution, something not available to probationary employees, further shows that the City did not consider Mr. Jackson as probationary until his supervisors began looking for a way to fire him.

The case cited by Defendant, *Paxton v City of Montebello*, 712 F. Supp 2d 1007 (C.D. Cal. 2010) anticipates a situation where the probationary period is intended for bona-fide training and observation. In *Paxton*, police officers were deployed for military service prior to completing their probationary period. Declining to apply the escalator principle, the trial court concluded it was proper not to advance the officers to the next step in the promotional process because they had not satisfied the bona-fide training and observation period. The probationary

period anticipated in *Paxton* is different that the time-in-position period required by the City.

The failure of the City to apply the escalator principle to Mr. Jackson resulted in him being denied the ability to use his earned and accrued leave to protect himself from discipline for absences that were later used to terminate him. It resulted in him being denied the right to appeal his termination to the Jefferson County Personnel Board. It ultimately made it easier for Will Goodman to act on his frustration toward Mr. Jackson's military leave and create a paper trail to justify terminating Mr. Jackson.

Summary judgment is due to be denied on Mr. Jackson's USERRA claims because he presented evidence from which a jury could find that his "probationary period" was not for bona-fide training and observation and that the period was satisfied through his twelve months of employment with the City. At a minimum, this is a fact question which a jury should resolve.[14]

## CONCLUSION

Will Goodman's frustration with Mr. Jackson's military leave and PTSD diagnosis led him to actively look for a way to terminate Mr. Jackson's employment because, as he said to Mr. Jackson, he did not want to deal with him

---

[14] The City argues Mr. Jackson is estopped from pursuing his USERRA claim because he filed for SSDI benefits. Mr. Jackson adopts and incorporates by reference his analysis raised in response to this argument in the context of the ADA.

or his condition. The evidence shows that Mr. Jackson was performing the duties of his job well, but that because of the ineffectiveness of his treatment for PTSD and the evolving nature of his treatment through the VA, he would be late to work, be absent, or have to leave work early. As a result, he asked the City for an accommodation in his schedule. Even though his female coworkers had atrocious attendance and at least one had received a modified work schedule to go to school, the City ignored Mr. Jackson's request. Rather than considering his request for accommodation or engaging in a dialogue with him about it, the City put together a plan to fire Mr. Jackson. Had the City not treated Mr. Jackson as a probationary employee and followed the escalator principle required under USERRA, he would have been able to use his accrued sick and vacation leave to cover his absences and avoid termination. Summary judgment is due to be denied.

Respectfully submitted,


/s/ Heather Newsom Leonard
HEATHER NEWSOM LEONARD
State Bar I.D. No.: ASB-1152-O61H

**OF COUNSEL:**

**HEATHER LEONARD, P.C.**
2105 Devereux Circle, Suite 111
Birmingham, AL 35243
Tel.: (205) 977-5421
Fax: (205) 278-1400
Email: Heather@HeatherLeonardPC.com

# CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2017, I served the foregoing on the following counsel for Defendant via electronic filing:

Michael K.K. Choy
Michael L. Lucas
Amy Jordan Wilkes
Attorneys for the City of Birmingham
**BURR & FORMAN LLP**
420 20th Street North
Suite 3400
Birmingham, AL

/s/ Heather Newsom Leonard
OF COUNSEL