# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ERIC JACKSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-cv-01349-MHH** |
| | } | |
| **THE CITY OF BIRMINGHAM,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Eric Jackson is a member of the Army National Guard and a former employee of the City of Birmingham.   He worked for the City as a parking enforcement officer from February 2012 until the City terminated his employment in August 2014.  While working for the City, Mr. Jackson was called to active duty in Afghanistan.  When he returned from his military service, Mr. Jackson suffered from PTSD.  Mr. Jackson's PTSD made it difficult for him to report to work on time or to complete full shifts.  Mr. Jackson asked the City to modify his work schedule to give his doctor time to regulate his PTSD medication.  The City did not grant Mr. Jackson's request for an accommodation, and the City terminated Mr. Jackson's employment for violating the City's attendance policy.

Mr. Jackson contends that the City violated the Uniformed Services Employment and Reemployment Rights Act or USERRA by classifying him as a probationary employee when he returned from his deployment, subjecting him to discipline, and ultimately terminating his employment. Mr. Jackson also contends that the City violated the Americans with Disabilities Act or ADA by failing to accommodate his PTSD and by terminating his employment because of his disability.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the City has asked the Court to enter judgment in its favor on the following issues: (1) whether the City violated USERRA by requiring Mr. Jackson to complete a probationary training period when he returned from military leave, and (2) whether Mr. Jackson is a qualified individual under the ADA. For the reasons explained below, the Court finds that material questions of fact exist, and the City is not entitled to judgment as a matter of law on these issues.[1]

## I.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine

---

[1] As part of his USERRA claim, Mr. Jackson contends that the City discriminated against him by disciplining him and terminating his employment. The City's motion for partial summary judgment does not address this aspect of Mr. Jackson's USERRA claim. In addition, the City's motion for partial summary judgment does not address Mr. Jackson's Title VII gender discrimination or ADA retaliation claims.

dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court cannot make credibility determinations regarding the evidence; that is the work of jurors. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano*, 707 F.3d at 1252 ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). When deciding a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *Bivens v. Bank of America, N.A.*, 868 F.3d 915, 918 (11th Cir. 2017); *see Feliciano*, 707

F.3d at 1252. Accordingly, the Court presents the evidence in the record in the light most favorable to Mr. Jackson because he is the non-movant.

## II.    RELEVANT FACTS

On January 17, 2012, the City hired Mr. Jackson as a parking enforcement officer. (Doc. 20-1, p. 18). A parking enforcement officer issues parking citations to motor vehicle operators who violate the City's parking ordinances. (Doc. 23-3, p. 1). According to the job description for the parking enforcement officer position, a parking enforcement officer performs the following essential functions:

> Patrols assigned area either by foot or vehicle; issues parking citations; informs violators of relevant parking laws and regulations. Assists the public by giving directions and informing them of available parking facilities; may assist the public in locating vehicles. Operates and programs hand held computer units and printers used to issue citations. Performs routine preventative maintenance on three-wheel vehicles. Assists the flow of traffic by asking drivers who are double parked, parked in loading zones, handicapped spaces or no parking zones to move to designated areas. Reports all damaged parking meters, street markers and signs.

(Doc. 23-3). One parking enforcement officer monitors each of the City's parking zones. (Doc. 20-1, p. 20, tp. 78). The regular work schedule for parking enforcement officers is Monday through Friday, 8:00 a.m. until 5:00 p.m. (Doc. 20-1, p. 23; Doc. 21-1, p. 14).

The parking enforcement officer position is a classified position. (Doc. 22-1, p. 16). Pursuant to Section 2.13 of the Supplemental Personnel Policies and Procedures for the City of Birmingham, "[c]lassified employees shall serve a

4

probationary period of twelve months." (Doc. 20-9, p. 6). According to City policy, "[c]lassified employees accrue sick leave or vacation leave during their probationary period however they may not use sick leave or vacation leave during their probationary period," unless their probationary period relates to a promotion. (Doc. 20-9, p. 6).

Mr. Jackson's direct supervisor was Parking Enforcement Officer Supervisor Jose Martinez. Mr. Martinez reported to Chief of Traffic Operations Will Goodman. Mr. Goodman reported to Traffic Engineer Greg Dawkins. (Doc. 20-1, p. 18, p. 69; Doc. 21-1, pp. 4-5; Doc. 22-1, p. 7; Doc. 23-1, pp. 5, 8-9; Doc. 23-2, p. 1).

During Mr. Jackson's first week of employment, senior parking enforcement officer Tiwana Bailey accompanied Mr. Jackson on his routes and provided him with training on how to use a hand-held set, how to operate the vehicle or buggy that parking enforcement officers drive, and how to write tickets. (Doc. 20-1, p. 20; Doc. 23-24, p. 5; Doc. 31-1, ¶ 2). During the second and third weeks of his employment, Mr. Jackson worked by himself in the field without supervision. (Doc. 20-1, pp. 22-23; Doc. 31-1, ¶ 2).

Mr. Jackson did not receive direct training on parking ordinances. Instead, his supervisors gave him the book containing the ordinances and told him to read the ordinances. (Doc. 20-1, p. 20). On February 6, 2012, Mr. Jackson attended an

orientation class on the City's general employment policies. (Doc. 20-1, p. 19; Doc. 31-1, ¶ 2).

On February 7, 2012, less than one month after the City hired him, Mr. Jackson received a letter from the Alabama Army National Guard to provide to the City. The letter stated that later that month, Mr. Jackson would be deployed to Afghanistan for one year. (Doc. 20-14). Mr. Jackson worked until February 9, 2012, and he reported to active duty on February 13, 2012. (Doc. 20-12; Doc. 20-13). Mr. Jackson completed less than one month of his 12-month probationary training period before he left for active military service. (Doc. 20-1, p. 22).

On June 14, 2012, while Mr. Jackson was on military leave, the City's Office of Personnel sent him a letter concerning his pay and benefits. (Doc. 20-19). The letter states, in relevant part:

> As you may know under the City of Birmingham's <u>Military Leave Resolution 392-08</u> (MLR 392-08) we will continue your pay and benefits while deployed to a "War Zone", or DOD specified area of Hostile Fire (HF) or Imminent Danger (ID). Your entitlements under this resolution are set to expire effective <u>February 16, 2013</u>. If for some reason you are maintained on active service past this date please provide this office with qualifying orders prior to the expiration of your current entitlement. In addition, if you are released from service prior to this date it is your responsibility to notify this office so that we may adjust your entitlements.
>
> We must also inform you that the MLR 392-08 is only a resolution and subject to termination by the Mayor/City Coun[cil] at their discretion. As a reminder continuation of your pay and benefits past 30 days are not mandated under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA).

. . .

Again thank you for your SERVICE!    YOUR COMMITMENT
KNOWS NO BOUNDS, NEITHER SHOULD OURS!

. . .

(Doc. 20-19) (emphasis in June 14, 2012 letter).    The City's Military Leave

Resolution 392-08 states:

> any permanent employee of the City of Birmingham called to duty in
> defense of country to be deployed in a military war zone will receive
> full salary as well as benefits for the entire time of their deployment.
> Upon which time that employee returns and is available to resume
> employment by the City of Birmingham, that employee's job or
> position will be available.

(Doc. 21-3, p. 1) (italics omitted).    Resolution 392-08 defines "permanent

employee" as a City of Birmingham "employee who has completed a mandatory

twelve (12) month probationary period."  (Doc. 21-3, p. 1).

In January 2013, Mr. Jackson returned from Afghanistan.  (Doc. 20-1, p.

24).  The National Guard extended Mr. Jackson's military service for another year

and assigned him to the Warrior Transition Battalion in Ft. Gordon, Georgia.  The

Warrior Transition Battalion is known as the Wounded Warrior Program.  (Doc.

20-15; Doc. 20-16; Doc. 20-17; Doc. 20-18; Doc. 31-1, ¶ 3).  While participating

in the program, Mr. Jackson received treatment for PTSD.  (Doc. 31-1, ¶ 3).

In January of 2014, the City gave Mr. Jackson a merit pay increase based on the amount of time that he had been employed with the City. (Doc. 23-1, p. 20; Doc. 23-4).

On February 18, 2014, Mr. Goodman emailed Mr. Dawkins, Mr. Martinez, and Assistant Traffic Engineer Sedrick Rutledge. (Doc. 23-5, p. 1). Mr. Goodman attached to the email pictures of Mr. Jackson. (Doc. 23-5, pp. 2-9). The email states: "Thought these pics of Parking Officer Eric Jackson would be of interest. As far as I know he is still on Traffic Engineering budget receiving his normal pay. Serious abuse of taxpayer dollars. Also see his CD under (Google….. Visionary Alter Ego)." (Doc. 23-5, p. 1).

On February 24, 2014, the Army honorably discharged Mr. Jackson from service for medical reasons. (Doc. 20-1, p. 25; Doc. 20-20). After his discharge, Mr. Jackson received a disability rating because of his PTSD diagnosis. (Sealed Doc. 27-3, p. 8; Doc. 31-1, ¶ 5).

On March 10, 2014, in an email to Mr. Goodman, the payroll coordinator for the City's traffic engineering department explained that Mr. Jackson had 90 days from the date of his discharge from the Army to report to work, so Mr. Jackson would return to work in May 2014. (Doc. 22-11). Mr. Goodman responded, "[n]ot cool with me at all. However, someone else calls the shots on these situations.

He's milking it!  If he can handle all of his other affairs he should be able to come to work."  (Doc. 22-11).

In a message dated March 11, 2014, Mr. Dawkins explained to Mr. Goodman that under federal law, the City must give Mr. Jackson 90 days from the end of his military service to report to work.  (Doc. 23-6, p. 1).  Mr. Goodman responded:

> I know the policy allows Mr. Jackson to report 90 days after the end of military duty.  I just have a problem with this whole flagrant abuse of the system.  Any one who can conduct a business, record rap videos and handle all of the other situations that he is managing has to be somewhat sound.  I wish Mrs. Polk would look into this whole policy of paying personnel a full salary while they're in a military status.  I think we're creating a loop hole for abusers.

(Doc. 23-7, p. 1).  Mr. Goodman continued to exchange emails with Mr. Dawkins about the rules and policies governing Mr. Jackson's return to work, and Mr. Goodman wrote that he would like to deny Mr. Jackson vacation "because we need him back asap."  (Doc. 22-12, p. 1).

Consistent with arrangements that he made with the City, Mr. Jackson returned to work on May 27, 2014.  (Doc. 20-1, p. 27; Doc. 20-24; Doc. 20-21; Doc. 20-22; Doc. 31-1, ¶ 4).  When he returned to work, Mr. Jackson did not consider himself a probationary employee because he had been employed with the City for more than two years, and based on the City's June 14, 2012 letter, he received benefits to which only permanent, non-probationary employees were

entitled. (Doc. 31-1, ¶ 4; *see also* Doc. 20-19; Doc. 21-3, p. 1). For the first week he was back on duty, a supervisor provided instructions to Mr. Jackson, but Mr. Jackson worked in the field independently. (Doc. 31-1, ¶ 4).

When he returned to work, Mr. Jackson was able to issue citations, patrol his assigned zone, and communicate with drivers. (Doc. 31-1, ¶ 6.b-e). Although he could perform his job functions, the medication that Mr. Jackson took to treat his PTSD caused sleeplessness which, in turn, caused Mr. Jackson, once he finally fell asleep, to sleep through alarms. (Doc. 31-1, ¶¶ 5, 6). Mr. Jackson's sleeplessness also made him "more easily triggered by loud noises and confrontation," and "loud noises or argumentative people increased [his] stress level." (Doc. 31-1, ¶¶ 5, 6.d). The effects of Mr. Jackson's PTSD medication caused him to miss work. Between May 27, 2014 and August 6, 2014, Mr. Jackson was absent 8 times; he arrived to work late 11 times, and he left work early 7 times. (Doc. 20-1, pp. 27, 29-33, 37; Doc. 20-24; Doc. 20-27). According to Mr. Jackson, when he was absent or late, he "always called or texted Jose Martinez or Tiwana Bailey in advance," and when he left work early, he "always obtained permission from a supervisor first." (Doc. 31-1, ¶ 9).

When Mr. Jackson began having attendance issues, he talked to Mr. Martinez and Mr. Goodman "about what [the City] could do to help him out." (Doc. 22-1, p. 16). Mr. Jackson explained that he had PTSD, and he "had

problems with loud noises, popping sounds, [and] crowded areas." (Doc. 22-1, p. 16, tp. 64). Mr. Jackson also told Mr. Martinez and Mr. Goodman that "he had problems with confrontations" (Doc. 22-1, p. 16, tp. 64), and "he was having a hard time dealing with the public getting in his face." (Doc. 21-1, p. 9, tp. 36).

Mr. Jackson requested "more frequent breaks" and "flexibility with [his] schedule to allow [him] and [his] doctor to adjust" his PTSD medication. (Doc. 31-1, ¶ 5). Mr. Jackson testified that he needed a "flexible" start time because the medications that he was taking were "constantly being switched out to see . . . which one worked better," and "it was always a different result after every time." (Doc. 20-1, p. 41). According to Mr. Jackson, had the City granted his request for an accommodation, his "attendance would have ultimately conformed to the traditional work schedule for a Parking Enforcement Officer," and his "stress would have been reduced because it would have allowed [his] doctors time to adjust [his] treatment regime[n]." (Doc. 31-1, ¶¶ 6.a., 6.d.).

In July 2014, Mr. Jackson again requested flexibility with his schedule while his doctor adjusted his medication. (Doc. 31-1, ¶ 7). Mr. Jackson asked that the City permit him to use leave for this purpose. (Doc. 31-1, ¶ 7). Mr. Martinez indicated that he would speak to Mr. Goodman about the requests for accommodation, but Mr. Jackson did not receive a response. (Doc. 20-1, p. 41).

The City did not evaluate whether Mr. Jackson's requests for accommodation were reasonable.  (Doc. 21-1, p. 10, tp. 38; Doc. 23-1, pp. 19, 32; Doc. 31-1, ¶ 7).

On July 3, 2014, Mr. Martinez emailed Mr. Goodman to tell him that Mr. Jackson called in sick.  (Doc. 21-10, p. 1).  Mr. Goodman responded:  "Okay. Thanks [this is] his way of cordially saying he does not want the job.  Let's go ahead and get our documentation prepared so that we can turn it over to Mr. Dawkins for dismissal."  (Doc. 21-10, p. 1).  On July 7, 2014, Mr. Martinez emailed some notes on Mr. Jackson to Mr. Goodman and explained his (Mr. Martinez's) "concern [that Mr. Jackson] may have personnel [sic] issues outside of work that he may have to resolve to be able to perform the job safely."  (Doc. 21-10, p. 1).[2]

On July 10, 2014, Charles Pinkney from the City's human resources department emailed Mr. Dawkins about a meeting between Mr. Pinkney and Mr. Martinez concerning Mr. Jackson.  (Doc. 23-9).  Mr. Pinkney's email states:

> Please see highlighted below.
>
> This is information in reference from my meeting earlier this morning with Mr. Martinez, in reference to Mr. Eric B. Jackson.  Mr. Jackson has just returned from his mobilization and so he is protected from discharge, only in the exception [if] it is for 'CAUSE.'

---

[2] Mr. Martinez attached to the email his notes about Mr. Jackson's progress.  The notes do not appear in text of the email, and the Court has not located the substance of the notes in the record.

Please ensure all matters of reprimand are handled in accordance with City of Birmingham and Personnel Board of Jefferson County rules and regulations, and in accordance with that listed below.

As I don't personally handle matters dealing with suspensions for COB employees, I have cc'd Human Resources Director: Peggy Polk and Dept. Dir. Debra Crook.

Any questions in regards to disciplinary actions can be addressed to them.

This information is for your guidance to ensure we remain in compliance with USERRA for active Guard and Reserve personnel.

(Doc. 23-9, p. 1).[3]

Also on July 10, 2014, Mr. Goodman presented Mr. Jackson with two written reprimands for absences associated with tardiness and absences on June 5, 2014; June 12, 2014; June 13, 2014; June 20, 2014; June 23, 2014; June 25, 2014; June 27, 2014; June 30, 2014; July 3, 2014; and July 8, 2014. (Doc. 20-32, pp. 1-4). The City placed Mr. Jackson on a corrective observation period through July 10, 2015. (Doc. 20-32, pp. 2, 4). Mr. Martinez and Mr. Goodman signed the reprimands. Mr. Jackson did not sign the reprimands. (Doc. 20-32, pp. 2, 4).

After receiving the reprimands, Mr. Jackson renewed his request for accommodation, telling Mr. Goodman that he needed flexibility with his schedule. (Doc. 20-1, pp. 41-42). Mr. Jackson does not remember what Mr. Goodman said in response to the particular request, but during one discussion about Mr. Jackson's

_____

[3] The information that Mr. Pinkney "listed below" is the text of § 4316 of USERRA. (Doc. 23-9, pp. 1-2).

PTSD, Mr. Goodman told Mr. Jackson that he could "tell when it's real" in reference to Mr. Jackson's statements about his PTSD and medication causing him to be late. (Doc. 20-1, p. 42; Doc. 20-1, pp. 54-55).

On July 14 or 15, 2014, Mr. Jackson gave the City a letter from Dr. Barbara Turner. (Doc. 20-1, pp. 39-40; Doc. 31-1, ¶ 7). Dr. Turner is a VA psychiatrist who treated Mr. Jackson for PTSD. (Doc. 20-1, p. 39). Dr. Turner's letter is dated July 14, 2014. (Doc. 20-1, p. 39). In the letter, Dr. Turner confirmed Mr. Jackson's PTSD diagnosis. Dr. Turner stated that she recommended that Mr. Jackson take FMLA leave, but Mr. Jackson did not believe that FMLA leave was necessary because he had made the City aware of his PTSD diagnosis "and may have to report off at times due to his current treatment plan." (Sealed Doc. 27-1, p. 2). Dr. Turner also explained that she recommended increasing the dosage of certain medication, but Mr. Jackson did not agree because he had "already missed time from work due to sedation and oversleeping." (Sealed Doc. 27-1, p. 2). Dr. Turner invited the City to contact her with questions. (Sealed Doc. 27-1, p. 2). About a week after Mr. Jackson gave the City Dr. Turner's letter, Mr. Jackson again tried to follow up with Mr. Martinez to determine whether Mr. Goodman had responded to his (Mr. Jackson's) requests for accommodation, but Mr. Jackson did not receive a response. (Doc. 20-1, p. 42; Doc. 31-1, ¶ 7).

In response to the letter from Dr. Turner, Mr. Dawkins removed Mr. Jackson from the street, assigned him to a desk, and told him to "read the [City's parking] ordinances until we tell you otherwise." (Doc. 20-1, p. 58; Doc. 31-1, ¶ 8). The City required Mr. Jackson to undergo a "fitness for duty" psychological examination at the University of Alabama at Birmingham. (Doc. 23-1, p. 35; Doc. 31-1, ¶ 8). On July 22, 2014, Mr. Jackson completed a psychological assessment online at UAB. (Doc. 20-1, pp. 43-44). Mr. Jackson did not meet with a doctor during this visit, and there was no interactive dialogue with a medical provider. (Doc. 20-1, p. 44).

Also on July 22, 2014, Mr. Jackson received another reprimand for clocking out on July 17, 2014, without his supervisor's approval. (Doc. 20-33, pp. 7-8). Under a section of the report titled "Future Conditions of Employment," the reprimand states:

> If you do not report to work or report off to your Supervisor before your designated shift begins, you will be disciplined for lateness or AWOL in accordance with the provisions of the Mayor[']s Administrative Directive WW-1, dated 10-27-75.
>
> If you accumulate 5 lateness[e]s or 3 AWOLs in one 12 month[] period, you will be dismissed.

(Doc. 20-33, p. 8).

On July 29, 2014, Mr. Dawkins sent Mr. Jackson a Notice of Determination Hearing. (Doc. 23-19, p. 1). The notice explained that the City contemplated

personnel action against Mr. Jackson that could result in suspension, demotion, or dismissal. (Doc. 23-19, p. 1). In the notice, the City indicated that Mr. Jackson had violated a number of Jefferson County Personnel Board rules and regulations for missing work, clocking in late, and leaving work early during July 2014. (Doc. 23-19, pp. 2-3). The City set a determination hearing for August 6, 2014, during which Mr. Jackson could respond to the City's statement. (Doc. 23-19, p. 1). The City later postponed the hearing until August 8, 2014. (Doc. 20-1, p. 37).

On July 30, 2014, the City issued three additional written reprimands to Mr. Jackson for absences or tardiness. (Doc. 20-33, pp. 1-6). Around this time, Mr. Goodman said during a meeting with Mr. Martinez, Ms. Bailey, and Mr. Jackson either "I don't want to deal with him" or "I don't want to deal with that[.]" (Doc. 20-1, p. 55). The remarks concerned Mr. Jackson's PTSD and Mr. Jackson's employment. (Doc. 20-1, p. 55).

On August 9, 2014, one day after the determination hearing, Mr. Dawkins issued a final decision terminating Mr. Jackson's employment effective August 11, 2014. (Doc. 20-37, p. 1). Before his termination, Mr. Jackson was "doing pretty good" in his job. (Doc. 23-24, p. 8, tp. 30). Although he had made some mistakes in writing tickets when he started, he had improved and reduced the mistakes, and he had become one of the City's top performers. (Doc. 20-1, p. 55, tp. 217; Doc. 23-24, p. 8, tpp. 30-31). Mr. Martinez believed that Mr. Jackson was physically

and mentally able to work. (Doc. 21-1, p. 26). Ms. Bailey did not observe Mr. Jackson having problems performing his job. (Doc. 23-24, p. 8).

On October 22, 2014, Dr. Adrian Thurstin completed Mr. Jackson's neuropsychological report based on the July 22, 2014 "fitness for duty" assessment. Dr. Thurstin confirmed a PTSD diagnosis. Dr. Thurstin recommended intense, consistent management of the PTSD and a review of Mr. Jackson's medications because the current regimen was not effective, and Dr. Thurstin recommended that Mr. Jackson be allowed to take breaks every 90 minutes to reduce stress. (Sealed Doc. 27-22, pp. 2-3). No one at the City discussed Dr. Thurstin's report with Mr. Jackson. (Doc. 20-1, p. 44). Based on the October 22, 2014 date, the record suggests that the City terminated Mr. Jackson before receiving the completed fitness for duty report.

## III.  ANALYSIS

### A.  Estoppel

Before examining the merits of the parties' positions, the Court addresses the City's contention that Mr. Jackson is judicially estopped from asserting his USERRA claim or arguing that he is qualified individual with a disability under the ADA because he (Mr. Jackson) applied for and received social security disability benefits.

"[P]ursuit, and receipt, of [social security disability] benefits does not automatically estop the recipient from pursuing an ADA claim." *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 797 (1999). Still, "an ADA plaintiff cannot simply ignore [his disability] contention that []he was too disabled to work. . . . [He] must explain why that [disability] contention is consistent with [his] ADA claim that []he could 'perform the essential functions' of h[is] previous job, at least with 'reasonable accommodation.'" *Cleveland*, 526 U.S. at 797. "[A] plaintiff's sworn assertion in an application for disability benefits that []he is, 'unable to work' will appear to negate an essential element of h[is] ADA case," unless the plaintiff offers a "sufficient explanation" for the contradiction. *Cleveland*, 526 U.S. at 806.

In his declaration, Mr. Jackson states that he "was not asked during the [social security disability] process if [he] could work with an accommodation." (Doc. 31-1, ¶ 10). Mr. Jackson maintains that "even though [he] was disabled, if provided a reasonable accommodation, [he] could work." (Doc. 31-1, ¶ 10). Like Mr. Jackson, the plaintiff in *Cleveland* explained that she represented to the Social Security Administration that she was totally disabled "in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work." *Cleveland*, 526 U.S. at 807. On the record before the Court, the City is not entitled to summary judgment based on a judicial estoppel argument.

*See Talavera v. School Bd. of Palm Beach County*, 129 F.3d 1214, 1220 (11th Cir. 1997) ("A certification of total disability on an SSD application does mean that the applicant cannot perform the essential functions of her job without reasonable accommodation. It does not necessarily mean that the applicant cannot perform the essential functions of her job *with* reasonable accommodation.") (emphasis in *Talavera*).

The ADA estoppel analysis applies equally to Mr. Jackson's USERRA claim. In support of its argument that Mr. Jackson is judicially and equitably estopped from asserting his USERRA claim, the City cites one non-binding opinion in which a district court held that a plaintiff was judicially estopped from bringing USERRA claims because the plaintiff had represented to the VA in previous litigation that he was disabled. (Doc. 26, pp. 22-23) (citing *Brown v. Con-Way Freight, Inc.*, 2016 WL 861210, at *6-8 (N.D. Ill. Mar. 7, 2016)). In *Brown*, the plaintiff had represented that "his injuries were permanent and that he was not going to recover." *Brown*, 2016 WL 816120, at *6. The City has presented no evidence in this case that Mr. Jackson represented that he had permanent injuries that would prevent him from performing his job. Rather, Mr. Jackson contends that he can work with an accommodation. Therefore, the Court is not persuaded by the rationale in *Brown*. *See Scudder v. Dolgencorp, LLC*, 900 F.3d 1000, 1007 (8th Cir. 2018) ("Under USERRA, an employer must make

'reasonable efforts ... to qualify' a returning service member for employment, which includes making 'reasonable efforts ... to accommodate ... a disability incurred in, or aggravated during, such service.' 38 U.S.C. § 4313(a). Accordingly, a service member who is considered 'disabled' under the Social Security Act could still be qualified for work and therefore entitled to reemployment under USERRA. *Cf. Cleveland,* 526 U.S. at 803, 119 S. Ct. 1597.").

### B.    USERRA

"Congress enacted USERRA to prohibit employment discrimination on the basis of military service as well as to provide prompt reemployment to those individuals who engage in non-career service in the military." *Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1234 (11th Cir. 2005) (citing 38 U.S.C. § 4301 (2002)).   Under USERRA, a veteran "does not step back on the seniority escalator at the point he stepped off.  He steps back on at the precise point he would have occupied had he kept his position continuously during the war." *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284-85 (1946).  An employer must return an employee to a position "which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by [a period of service in the uniformed services], or a position of like seniority, status and pay, the duties of which the person is qualified to perform[.]"  38 U.S.C. § 4313(a)(2)(A).  This statutory obligation commonly is

known as the "escalator principle." 20 C.F.R. § 1002.192 ("In all cases, the starting point for determining the proper reemployment position is the escalator position, which is the job position that the employee would have attained if his or her continuous employment had not been interrupted due to uniformed service.").[4]

"USERRA rights are not diminished because an employee holds a temporary, part-time, probationary, or seasonal employment position." 20 C.F.R. § 1002.41. Mr. Jackson contends that the City violated USERRA because the City reinstated his probationary period when he returned from military service. According to Mr. Jackson, but for his military service, he would have been employed with the City long enough to qualify as a permanent employee, and the City's insistence that he complete his probationary period is inconsistent with the escalator principle. The City contends that it was within its rights to reinstate Mr. Jackson as a probationary employee because Mr. Jackson did not complete the required training for the parking enforcement officer position before he was deployed.

Under USERRA, an employer may extend a probationary training period to account for time that an employee is on military leave. *See Gipson v. Cochran*, 90 F. Supp. 3d 1285, 1299 (S.D. Ala. 2015) (Because "USERRA was [] never

---

[4] "[A]lthough 'USERRA cannot put the employee in a *better* position than if he or she had remained in the civilian employment position,' 20 C.F.R. § 1002.42(c) (emphasis added), the Act 'must be broadly construed in favor of its military beneficiaries.' *Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 551 (8th Cir. 2005) (quoting *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312–13 (4th Cir. 2001))." *Mace v. Willis*, 897 F.3d 926, 928 (8th Cir. 2018).

intended to allow a person to be exempt from necessary and important training for a job . . . extending a training period, in part, to make up for absences due to military leave, does not violate USERRA."); *Paxton v. City of Montebello*, 712 F. Supp. 2d 1007, 1013 (C.D. Cal. 2010) ("As a general matter, a probationary employee can be required to complete his probationary period following his return from military leave.").  But the Department of Labor's regulations governing USERRA instruct that the probationary period must be "a bona fide period of observation and evaluation."  *See* 70 Fed. Reg. 75246, 75272, 2005 WL 3451172. The regulations state:

> if an employee who left employment for military service was in the midst of a bona fide apprenticeship program or probationary period that required actual training and/or observation in the positions, rather than merely time served in the position, the employee should be allowed to complete the apprenticeship or probationary period following reemployment.

70 Fed. Reg. 75246, 75272, 2005 WL 3451172.  Relying on *Gipson* and *Paxton*, the City submits that the parking enforcement officer "probationary period is used to both train and evaluate [parking enforcement officers] for the first year of their employment, and [Mr.] Jackson cannot show a reasonable certainty or high probability that he would have satisfactorily completed the probationary period had he continuously remained employed."  (Doc. 26, p. 25).

In *Gipson*, the sheriff's department where the plaintiff worked required a sheriff's deputy "to go through a 'Working Test Period' or probation for one year."

*Gipson*, 90 F. Supp. 3d at 1288. The record demonstrated that the department used the training period to both train and evaluate new deputies:

> [a] deputy initially goes through Field Training and is assigned a Field Training Officer (FTO). The FTO documents the deputy's work performance and training on a daily and weekly basis. Field Training is scheduled to last 8 weeks and at such time the new deputy is deemed able to perform the job solo and is assigned to a squad. Once assigned to a squad, the new deputy is evaluated quarterly with the expectation of completing the Working Test Period within a year of being hired. If the Working Test Period is successfully completed, the deputy then becomes a permanent deputy.

*Gipson*, 90 F. Supp. 3d at 1288-89. During her one year probationary period, the plaintiff was absent from duty periodically for military training and ultimately went on military leave. *Gipson*, 90 F. Supp. 3d at 1289-90. The plaintiff claimed that when she returned to the sheriff's department, the department violated USERRA by extending the one year Working Test Period because of her military service. *Gipson*, 90 F. Supp. 3d at 1288. The district court found that the department's extension of the probationary period was not an adverse action under USERRA because "the extension did not alter in any way [the deputy's] employment status." *Gipson*, 90 F. Supp. 3d at 1299 (emphasis omitted). There was no question in *Gipson* that the training period was a legitimate period of instruction and monitoring.

In *Paxton*, the city of Montebello, California hired the plaintiffs as police officer trainees and soon classified the plaintiffs as probationary police officers.

*Paxton*, 712 F. Supp. 2d at 1008.  The California Army National Guard activated the plaintiffs for military service, and approximately eight months into their probationary status, the plaintiffs were deployed to Iraq.  *Paxton*, 712 F. Supp. 2d at 1008-09.  The plaintiffs argued that under USERRA's escalator principle, their probationary period should have ended while they were deployed and that the City violated USERRA when it reinstated the plaintiffs as probationary police officers when they returned from military leave.  *Paxton*, 712 F. Supp. 2d at 1013.  Citing the Department of Labor's regulations indicating a returning service member must complete a period of probation if the "probationary period is a bona fide period of observation and evaluation," the district court found that the City's actions did not run afoul of USERRA's protections.  *Paxton*, 712 F. Supp. 2d at 1013.

The facts in *Gipson* and *Paxton* are unlike the facts of this case.  Here, Mr. Jackson has submitted evidence from which a reasonable jury could decide that the City's one year probationary period was not a bona fide period of observation and training and that Mr. Jackson completed his actual training as a parking enforcement officer and his initial period of evaluation before he was deployed.

The City's 12-month probationary period applied to all classified positions across the City.  The probationary period was not tailored for the parking enforcement officer position.  (Doc. 20-9, p. 6).  And unlike the probationary periods in *Gipson* and *Paxton*, the evidence here suggests that a parking

enforcement officer could satisfy the City's 12-month probationary period merely through time served in the position.

The evidence viewed in the light most favorable to Mr. Jackson demonstrates that after his initial week as a parking enforcement officer, he worked without regular supervision until he was deployed. (Doc. 20-1, pp. 22-23; Doc. 31-1, ¶ 2). According to Mr. Martinez, the City usually would spend two or three weeks training a parking enforcement officer before the officer would patrol a parking zone independently, but a senior parking enforcement officer would "keep[] tabs," "check[] up on," and "shadow[]" parking enforcement officers "every once in a while" after the initial training period. (Doc. 21-1, p. 13). But Mr. Jackson has explained that other than his initial week of training, when he returned from military leave, for one week, a supervisor again provided direction "on how to write parking tickets, traffic ordinances, and patrol routes," but then he (Mr. Jackson) patrolled his parking zones "without observation." (Doc. 31-1, ¶ 4).

In addition, Mr. Jackson has presented evidence from which jurors could conclude that the City did not consider the 12-month probationary period a bona fide period of observation and training. First, while Mr. Jackson was on military leave, the City awarded Mr. Jackson pay and benefits consistent with the City's Military Leave Resolution 392-08. (Doc. 20-19). The City provides benefits under Military Leave Resolution 392-08 only to permanent employees who have

completed their probationary period. (Doc. 21-1, p. 16; Doc. 21-3, p. 1). Second, while Mr. Jackson was on military leave, the City awarded Mr. Jackson a merit pay increase based on the time that Mr. Jackson had been employed with the City. (Doc. 23-1, p. 20; Doc. 23-4).

Thus, the evidence concerning the nature of the City's 12-month probationary period for new parking enforcement officers is disputed. Therefore, the City is not entitled to judgment as a matter of law on Mr. Jackson's claim that the City violated USERRA by extending his probationary period.

## B. Qualified Individual Under ADA

To prevail on his ADA failure to accommodate and discriminatory termination claims, Mr. Jackson must establish that he is a "qualified individual" under the statute. 42 U.S.C. § 12112(a) (Under the ADA, an employer may not discriminate against a "qualified individual on the basis of disability."); s*ee Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 828 (11th Cir. 2015) (To establish a prima facie case of discriminatory termination under the ADA, "a plaintiff must show three things: (1) he is disabled; (2) he is a qualified individual; and (3) he suffered unlawful discrimination because of his disability."); *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) ("An employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination

under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship.") (emphasis omitted).

The ADA defines a "qualified individual" as an "individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job in question." *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017); *see Medearis v. CVS Pharmacy*, 64 Fed. Appx. 891, 895 (11th Cir. 2016) ("An accommodation is reasonable and necessary under the ADA 'only if it enables the employee to perform the essential functions of the job.'") (quoting *Holly*, 492 F.3d at 1256).

With respect to the essential functions of a position, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also Jarvela*, 776 F.3d at 829 ("[A] written job description is considered evidence of the essential functions of a particular position."). According to the EEOC's regulations implementing the ADA, a court also may consider: "(1) the amount of time spent on the job

performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (internal quotation marks and citation omitted).

According to the City's parking enforcement officer job description, at a minimum, the essential functions of the position include: issuing parking citations; patrolling assigned zone by foot and/or vehicle; communicating and interacting with the public; informing violators of parking laws and regulations; providing information to members of the public regarding directions and parking facilities; and asking drivers to move their vehicles to designated areas. (*See* Doc. 23-3). Citing the regulation that permits the Court to consider "[t]he consequences of not requiring the incumbent to perform the function," the City maintains that "regular and consistent attendance is uniquely essential" for a parking enforcement officer. (Doc. 26, p. 13) (citing 29 C.F.R. § 1630.2(n)(3)(iv)); *see also Garrison v. City of Tallahassee*, 664 Fed. Appx. 823, 826 (11th Cir. 2016) (recognizing that the district court properly gave substantial weight to the employer's judgment that "physical presence in the office during regular business hours was an essential function" of the plaintiff's customer service position which required her to communicate with internal representatives and external vendors on site and to

conduct training sessions in the office). According to supervisors in the City's traffic department, the parking enforcement officer work schedule of 8:00 a.m. to 5:00 p.m. Monday through Friday is based on the time that most businesses are open. (Doc. 22-1, p. 17). One parking enforcement officer monitors one of the City's nine parking zones. (Doc. 20-1, p. 20; Doc. 21-1, p. 6; Doc. 22-1, p. 18). If a parking enforcement officer is unable to monitor his or her zone, "that area will just go unchecked." (Doc. 23-1, p. 12).

Mr. Jackson does not argue that regular and consistent attendance is not an essential function of the parking officer position, and Mr. Jackson has not offered evidence to create a question of fact with respect to the City's judgment that attendance at work is an essential function of the parking enforcement officer position. (*See generally* Doc. 32, pp. 14-15). Instead, Mr. Jackson submits that "this was where [his] request for an accommodation came into play." (Doc. 32, p. 15).

The evidence establishes that Mr. Jackson could perform the essential physical functions of the parking enforcement officer position while he was at work. (*See* Doc. 23-24, p. 8; Doc. 31-1, ¶ 6). Mr. Jackson's supervisors believed that he was physically and mentally able to work, and they did not observe that Mr. Jackson had trouble performing his job. (Doc. 21-1, p. 26; Doc. 23-24, p. 8). To the extent that Mr. Jackson had difficulty arriving on time or completing full shifts

because of sleeplessness or because of the anxiety and stress that he experienced when he encountered loud noises, flashing lights, or conflict with citizens, Mr. Jackson requested that the City modify his work schedule in two ways. First, Mr. Jackson requested a flexible start time. (Doc. 20-1, p. 41). Second, Mr. Jackson asked that the City permit him to use "leave time" while his doctors regulated his PTSD medication. (Doc. 31-1, ¶ 7).[5]

With respect to the request for leeway with his start time, Mr. Jackson testified that he needed a "flexible" start time because the medications that he was taking were "constantly being switched out to see. . . which one worked better," and "it was always a different result after every time" that Mr. Jackson took a different medication. (Doc. 20-1, p. 41). Mr. Jackson did not request to work at a particular time each day because he "couldn't pin down the time where I knew I would be in the office." (Doc. 20-1, p. 41). Mr. Jackson testified that a later start time would "offset the unpredictability of the sleeping meds," and that he could report to work "with the proper amount of sleep to be able to function and carry on throughout the day the way [he was] supposed to." (Doc. 20-1, p. 42). No medical provider indicated that Mr. Jackson needed a flexible work schedule, and Mr.

---

[5] Mr. Jackson also requested more frequent and longer breaks and time off for doctor's appointments. (Doc. 20-1, pp. 40-41). Mr. Jackson testified that the City allowed him multiple breaks; that no one limited the number of restroom breaks he could take; and that the City gave him time off for his doctor's appointments. (Doc. 20-1, pp. 40, 41). The only request that the City did not accommodate was Mr. Jackson's request for a modified work schedule. (Doc. 20-1, p. 41).

Jackson did not provide the City documentation from a doctor stating that he needed a flexible start time.  (Doc. 20-1, p. 42).

Under the ADA, a reasonable accommodation may include "part time or modified work schedules."  42 U.S.C. § 12111(9)(B).  In this case, Mr. Jackson's request for a modified work schedule is not a reasonable accommodation because in essence, Mr. Jackson asked to arrive at work when he wished, with no consistent start time or predictability in his schedule.  In *Jackson v. Veterans Administration*, 22 F.3d 277 (11th Cir. 1994), the Eleventh Circuit held that a housekeeping aide at a Veterans Administration hospital was not a qualified individual when he "was absent numerous times within the first few months of his probationary employment on a sporadic, unpredictable basis," and as a result, he "could not fulfill the essential function of . . . being present on the job."  22 F.3d at 279.  In reaching its conclusion, the Eleventh Circuit noted that the plaintiff's requested accommodation of swapping days off with other employees, delays in his shift start times, and deferring more physically demanding tasks until another day:

> [did] not address the heart of the problem:  the unpredictable nature of [plaintiff's] absences.  There is no way to accommodate this aspect of his absences.  Requiring the VA to accommodate such absences would place upon the agency the burden of making last-minute provisions for [his] work to be done by someone else.

*Id*. at 279.

Concerning his request for a flexible start time, Mr. Jackson testified: "I couldn't pin down the time where I knew I could be in the office," and "all I could say is leeway. It's kind of an open – it's nothing that can be predicted." (Doc. 20-1, pp. 41, 42). Given the unpredictable nature of Mr. Jackson's request for a flexible start time, Mr. Jackson has not demonstrated that his request for a flexible start time constitutes a reasonable accommodation. *See Jackson*, 22 F.3d at 279; *see also Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) ("A request to arrive at work at any time, without reprimand, would in essence require Appellee to change the essential functions of Appellant's job, and thus is not a request for a reasonable accommodation.").[6]

The reasonableness of Mr. Jackson's request to take leave while his doctors adjusted his PTSD medication is a closer call.[7] "[A] leave of absence might be a reasonable accommodation in some cases." *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003); Appendix to 29 C.F.R. § 1630.2(o) ("[A]ccommodations could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment.").

The Eleventh Circuit first addressed the issue of the reasonableness of a request for a leave of absence in *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222

---

[6] In his brief, Mr. Jackson notes that the City has provided a modified work schedule to another parking enforcement officer, but the modified schedule was predictable. (Doc. 32, p. 15).

[7] The City did not address this requested accommodation in its briefs.

(11th Cir. 1997). In a recent unpublished opinion, the Court of Appeals explained

*Duckett's* holding and rationale:

> [In *Duckett*,] we held that an employer was not required to allow an employee to stay on medical leave under a salary continuation program. *See id.* at 1225–26. Relying on the Fourth Circuit's decision in *Myers v. Hose*, 50 F.3d 278, 282 (4th Cir. 1995), we explained that an employer does not violate the ADA "by refusing to grant an employee a period of time in which to cure his disabilities where the employee sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions." 120 F.3d at 1225–26 (brackets and internal quotation marks omitted). We quoted with approval the following reasoning of the *Myers* court regarding leave as a reasonable accommodation:
>
> > Significantly, these provisions [42 U.S.C. § 12111(8); 45 C.F.R. § 1232.3(i)] contain no reference to a person's *future* ability to perform the essential functions of his position. To the contrary, they are formulated entirely in the present tense, framing the precise issue as to whether an individual "can" (not "will be able to") perform the job with reasonable accommodations. Nothing in the text of the reasonable accommodation provision requires an employer to wait for an indefinite period for an accommodation to achieve its intended effect. Rather, reasonable accommodation is by its terms most logically construed as that which, presently, or in the immediate future, enables the employee to perform the essential functions of the job in question.
>
> *Id.* (quoting *Myers*, 50 F.3d at 283).

Because the plaintiff in *Duckett* "had already been on medical leave for ten months ... and had no way of knowing when his doctor would allow him to return to work in any capacity," we concluded that his requested accommodation of additional medical leave was not reasonable. *See id.* at 1226. Nevertheless, we noted that more compelling facts might lead to a different result, such as "if an

employee was terminated immediately upon becoming disabled without a chance to use his leave to recover." *Id.* n.2.

*Billups v. Emerald Coast Utilities Authority*, 714 Fed. Appx. 929, 934 (11th Cir. 2017).

Following *Duckett*, in *Wood*, the Eleventh Circuit held that an employee's request for a leave of absence to recover from cluster headaches was not reasonable.

> [In *Wood*, w]e explained that *Duckett* had held "that an accommodation is unreasonable if it does not allow someone to perform his or her job duties in the present or in the immediate future." *Id.* at 1313. Thus, "a leave of absence might be a reasonable accommodation in some cases" if it would allow an employee to continue work "in the immediate future." *Id.* at 1314. But an accommodation is unreasonable if it would only allow an employee to "work at some uncertain point in the future." *Id.*
>
> Based on these standards, we held that Wood's requested accommodation was not reasonable because he was essentially requesting indefinite leave. *Id.* Even with a leave of absence, "he could be stricken with another cluster headache soon after his return and require another indefinite leave of absence." *Id.* Thus, Wood was not requesting an accommodation that would have allowed him to continue to work presently, "but rather, in the future—at some indefinite time." *Id.* We also distinguished *Duckett*'s "parenthetical[ ] not[ation] that more compelling facts might lead to a different result," stating that Wood had not been "terminated immediately upon becoming disabled," but rather "had been granted years of discretionary leave and had been on a discretionary leave for over one month at the time of his termination." *Id.*

*Billups*, 714 Fed. Appx. at 935.

Applying *Duckett* and *Wood*, in *Billups*, the Court of Appeals held that an employee's request to extend unpaid leave was unreasonable. *Billups*, 714 Fed. Appx. at 935-36. In *Billups*, the plaintiff took 12 weeks of FMLA leave to recover from a shoulder strain and a related surgery. *Billups*, 714 Fed. Appx. at 931. Because the plaintiff's injury was job-related, the employer's policy permitted the plaintiff to take 26 weeks of leave instead of 12. *Billups*, 714 Fed. Appx. at 931. Near the end of the 26-week period, the employer sent a notice to the plaintiff informing him "of the policy that employees who suffer an on-the-job injury generally must return to work within six months or retire, resign, or be terminated." *Billups*, 714 Fed. Appx. at 932. The notice stated that the plaintiff could attend a "predetermination" hearing. *Billups*, 714 Fed. Appx. at 932. The plaintiff attended the hearing, and the employer gave him additional time to "obtain a more definitive statement of a return date from his physician or physical therapist." *Billups*, 714 Fed. Appx. at 932.

The plaintiff submitted a letter from his physical therapist which stated that the plaintiff was progressing through therapy. The note explained that the plaintiff could return to work when he completed his physical therapy sessions, but only the plaintiff's doctor "could clear him to return to work." *Billups*, 714 Fed. Appx. at 932-33. Several days later, the employer terminated the plaintiff's employment. *Billups*, 714 Fed. Appx. at 933.

The plaintiff sued his former employer contending that the employer should have accommodated his disability by offering a limited period of unpaid leave while he continued to recover from surgery. *Billups*, 714 Fed. Appx. at 933. On appeal, the Eleventh Circuit concluded that the plaintiff had not demonstrated that he was a qualified individual under the ADA because he had not shown that his request for extended unpaid leave "would have allowed him to return to work 'in the present or in the immediate future.'" *Billups*, 714 Fed. Appx. at 934 (quoting *Wood*, 323 F.3d at 1314). The Court of Appeals distinguished the chronic disabling conditions at issue in *Duckett* and *Wood* from the temporary nature of the plaintiff's disability. The Court explained that the plaintiff's "condition was likely to be fully corrected, or nearly so at some point in the future," but the Court concluded that the requested accommodation was not reasonable "under the legal standards set out in *Wood* and *Duckett*" because the plaintiff "was essentially requesting a leave of absence that would allow him to work 'at some indefinite point' in the future." *Billups*, 714 Fed. Appx. at 935 (quoting *Wood*, 323 F.3d at 1314). In other words, the plaintiff's "request for additional leave was essentially an open-ended request for "'sufficient time to ameliorate his conditions'" following surgery. *Billups*, 714 Fed. Appx. at 936 (quoting *Duckett*, 120 F.3d at 1226).

The Court of Appeals noted that the plaintiff's employer did not terminate him when he became disabled, but instead, the employer allowed the plaintiff to take six months of medical leave. *Billups*, 714 Fed. Appx. at 936. Although that period of leave was not enough for the plaintiff to demonstrate that he could return to work, in light of the employer's "allowance of six months of leave and the uncertainty about when [the plaintiff] could perform the essential functions of his position in the future," the plaintiff failed to show "that a reasonable jury could conclude that he was denied a reasonable accommodation that would have allowed him to perform the essential functions of his job either presently or in the immediate future." *Billups*, 714 Fed. Appx. at 936.

Significantly, in *Duckett*, *Wood*, and *Billups*, the plaintiffs' employers had allowed the plaintiffs to take anywhere from six months to years of discretionary leave before the plaintiffs requested additional or extended leave. *See Duckett*, 120 F.3d at 1226 ("Plaintiff had already been on medical leave for ten months, . . . and had no way of knowing when his doctor would allow him to return to work in any capacity."); *Wood*, 323 F.3d at 1314 (the employer granted "years of discretionary leave," and the plaintiff "had been on discretionary leave for over one month at the time of his termination"); *Billups*, 714 Fed. Appx. at 936 (employer granted plaintiff "over six months of medical leave to allow recovery").

In this case, Mr. Jackson offers few details about the nature of his request for leave while doctors adjusted his PTSD medication. Mr. Jackson asked that the City allow him "to use leave time while [his] medication was being adjusted[.]" (Doc. 31-1, ¶ 7). Mr. Jackson contends that had the City granted his requests for an accommodation, his "attendance would have ultimately conformed to the traditional work schedule for a Parking Enforcement Officer," and his "stress would have been reduced because it would have allowed [his] doctors time to adjust" his medication to better treat his PTSD symptoms. (Doc. 31-1, ¶¶ 6.a, 6.d).

As explained above, Mr. Jackson's evidence creates a question of fact about whether the City should have classified him as a probationary or permanent employee upon his return from military leave. As a permanent employee, Mr. Jackson could have taken paid vacation and sick leave consistent with the City's personnel policies and the rules and regulations of the Personnel Board of Jefferson County. (Doc. 20-1, p. 20; Doc. 20-9, p. 6; Doc. 20-11, pp. 55-56).[8] In addition, the City's policies also allow employees to take unpaid leave under the Family and Medical Leave Act (FMLA). (Doc. 20-11, p. 59). Under certain

---

[8] Permanent employees "may use accrued vacation leave for any purpose." (Doc. 20-11, p. 55). Permanent employees may use accrued sick leave for, among other things, "[p]ersonal illness of the employee," and "for any other reason, directly related to the health and wellness of the employee, which in the judgment of the Appointing Authority, constitutes good and sufficient justification for the use of sick leave." (Doc. 20-11, p. 56).

circumstances, the City also permits employees to take extended medical or disability leave without pay for up to one year. (Doc. 20-11, p. 60).[9]

With or without these leave opportunities, the evidence viewed in the light most favorable to Mr. Jackson demonstrates that the City was not interested in giving him time to demonstrate that he could return to work "in the present or in the immediate future." *Wood*, 323 F.3d at 1314. Before Mr. Jackson returned from military leave, Mr. Goodman asked why the City still was paying Mr. Jackson. (Doc. 22-11; Doc. 23-5, p. 1; Doc. 23-7, p. 1). Five weeks after Mr. Jackson returned, after he called in sick one day, Mr. Goodman stated that the City needed to get "documentation prepared" for dismissal. (Doc. 21-10). Mr. Goodman repeatedly reprimanded Mr. Jackson, stating that he (Mr. Goodman) could tell when PTSD was real and remarking that he did not "want to deal" with Mr. Jackson or his PTSD. (Doc. 20-1, p. 41; Doc. 20-1, pp. 54-55).

Within weeks of Mr. Jackson requesting an accommodation and within days of Mr. Jackson submitting a letter from his VA psychiatrist concerning his condition that suggested FMLA leave as a proper course, the City removed Mr. Jackson from his patrol and sent him to UAB for a "fitness for duty" examination. Three weeks later, after additional reprimands for tardiness and absences and

---

[9] The City's extended medical/disability leave of absence policy provides that "[a]n employee who has exhausted all other available forms of leave, and is unable to perform the essential functions of his or her job with or without reasonable accommodation, may be granted an unpaid leave of absence of up to one (1) year." (Doc. 20-11, p. 60).

before the City received the fitness for duty report from UAB, the City terminated Mr. Jackson's employment. These are the "more compelling facts" that the *Duckett* Court contemplated when it explained that "ADA regulations may possibly be violated if an employee was terminated immediately upon becoming disabled without a chance to use his leave to recover." *Duckett*, 120 F.3d at 1226 n.2.

Because a question of fact exists concerning the reasonableness of Mr. Jackson's request to take leave while his doctors adjusted his PTSD medication and because successful adjustment of his medication could have enabled Mr. Jackson to maintain the City's regular work hours without accommodation, a question of fact exists concerning Mr. Jackson's status as a qualified individual under the ADA.

## IV. CONCLUSION

For the reasons stated above, the Court denies the City's motion for partial summary judgment. (Doc. 25).

**DONE** and **ORDERED** this 6th day of March, 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE